# William J. Barr's Estate v. Marcell Guay and Carolyn Guay

[ 250 A.2d 512 ]

December Term, 1968

Present: Shangraw, Barney, Smith, Keyser, JJ., and Brooks, Supr. J.

Opinion Filed February 4, 1969

*Robert H. Brown, Esq.,* for the Plaintiff.

*Yandell & Page* for the Defendants.

**Keyser, J.** This controversy centers on the fixation of the boundary line between the lots owned by the parties on the shore of Lake Champlain. The case is here on appeal by the plaintiff after retrial on remand. See 125 Vt. 1, 209 A.2d 304. Since then the plaintiff has deceased and the case proceeded with the administrator of the estate as party plaintiff. On rehearing, the transcript of the prior testimony together with the admitted exhibits were received into evidence by agreement of the parties.

The court below found the boundary line between the two properties as claimed by the defendants and judgment order issued accordingly. The plaintiff contends that the evidence does not support the result reached by the trial court.

In 1929, P. J. Farrell *et ux* owned a tract of land in North Hero lying between U.S. highway No. 2 and the east shore of Lake Champlain. Conveyances were first made at the outside boundaries of the tract and progressed north and south. The Guay lot was the last, or most northerly, of the southerly lots conveyed and its boundaries are oriented only to the previous deeds of lots to the south of it. The last, or remaining, lot sold in the tract was the Barr lot and its boundaries are descriptively related to the lots north of it. It is plaintiff's southern boundary that is sought to be established. Thus, a determination of the northern Guay boundary is required to settle the controversy.

The description given in the Barr deed is as follows:

"A certain lot of land having a frontage on Lake Champlain of one hundred and eighty (180) feet, more or less.

"Said lot is bounded on the south by land owned by Marcell and Carolyn Guay; on the north by land owned by one John Stephen and wife; on the west by the highway Route U.S. #2, and on the east by the waters of Lake Champlain.

"The eastern boundary of the lot extends north one hundred and eighty (180) feet from the established boundary, more or less, and the western boundary extends two hundred (200) feet from the established boundary, more or less (highway frontage). The northern boundary of the lot runs parallel with the established southern boundary.

"There is also conveyed to the grantees herein a right-of-way in common with others over the existing road leading from Route U.S. #2, to the premises herein conveyed.

"The lot of land hereby conveyed is the remaining part of a parcel of land conveyed to the grantor herein by Warranty Deed to Eileen Farrell, dated August 17, 1945, and of record in Vol. 15, page 550 of North Hero Land Records, after the conveyance of two lots of land by this grantor, one being to Stephen and wife, by Warranty Deed dated June 11, 1956 and of record in Vol. 23, page 227 of North Hero Land Records, and the other being a deed to Marcell Guay and Carolyn Guay, dated November 4, 1957, and recorded in Vol. 23, page 409 of North Hero Land Records."

There are two lots located immediately to the north of the Barr lot, the first and adjoining one is the Stephens lot and the one next north is the Cordner lot. The Cordner lot, the first lot sold off the tract, was

conveyed by P. J. Farrell and wife to Effie S. Thomas. This lot was later acquired by Cordner in 1933.

In 1938 the state highway department relocated a section of U.S. highway Route No. 2 in the area. This required acquisition by the state of a part of the Farrell land on the east side. Mr. Farrell then owned what are now the Stephens, Barr and Guay lots. At that time (1938) there was a wire fence which marked the north line of the Farrell land and the southerly line of the Cordner lot. The highway department used this established lot line in its survey and placed a concrete marker at the westerly end of the boundary. This marked the northwesterly corner of the Farrell land after Mr. Farrell's deed to the state. There is no dispute between the parties but that the wire fence is the established southerly line of the Cordner (formerly Thomas) land.

In 1945 P. J. Farrell conveyed what are now the Stephens, Barr and Guay lots to Eilleen Farrell and she in turn deeded the same land to Leroy S. Walker who was the common grantor of the Stephens, Guay and Barr lots. Stephens *et ux* acquired their lot 100 feet in width in 1956. The deed recited that the lot was bounded "on the north by lands owned by one Cordner" and "on the south by lands owned by the Grantor Leroy S. Walker, this boundary is run parallel to established northern boundary." Since the Barr lot adjoins the Stephens lot on the south it is clear that the established northern boundary of the plaintiff's lot is parallel to the Cordner and Stephens southerly lines.

The deed from Walker to the Guays describes the lot as follows:

"A certain lot of land with a building thereon, having a frontage on Lake Champlain of One Hundred Fifty (150) feet. Said lot is bounded on the South by the established boundary of lands owned by one Kropper; on the East by the waters of Lake Champlain; on the West by U.S. Route #2; on the North by land owned by the Grantor herein, Leroy S. Walker.

"The Eastern boundary of lot extends North One Hundred Fifty (150) feet Lake front from the established boundary, and the Western boundary extends North one Hundred Fifty (150) feet from the established boundary, (highway frontage) The Northern boundary of lots runs parallel to the established Southern boundary."

The location of the Guay northern line is dependent upon the data derived from prior deeds conveying the lots to its south. It is from that source that the "established Southern boundary" is to be determined.

The second conveyance out of the Farrell tract was from its southern end in 1930 and was the first of the southern lots sold. At that time P. J. Farrell *et ux* deeded a lot carrying a width of 100 feet to Malcolm G. Clark. One pertinent provision of the deed reads:

"Said lot of land to contain one hundred feet of shore front and to extend back from the shore front one hundred feet in width to said U.S. highway #2, *the northerly and southerly boundaries of said lot to be parallel with the lines of land sold by the Grantors hereof to Mrs. Effie S. Thomas in September 1929."* (Italics added).

Here we have a firm and definite relationship between the lines of the Clark lot with the lines of the Thomas (Cordner) lot at the extreme north of the tract. The lines of these two lots are fixed by the deed as being parallel with each other. The north line of the Clark lot thus became at that time "the established Southern boundary."

In 1938 the state highway department placed a concrete marker at the northwest corner of the Clark lot. This tied in with the description given in the Farrell deed to the state which shows that the distance between the north and south concrete state markers is 774 feet.

In 1940 P. J. Farrell conveyed a lot northerly of and adjoining the Clark lot to the same M. G. Clark. This lot carried a width of 130 feet commencing at the state marker in Clark's northwesterly boundary. Subsequently, Clark conveyed a lot off the north side of his land 100 feet in width to John H. Baker *et ux*. The call of this deed is for the northerly and southerly lines to be parallel, the northerly line being related back to the Farrell deed to Clark. After this the Bakers acquired from Mr. Farrell a strip of land immediately northerly of their lot which carried a width of 50 feet.

Continuing northerly, Mr. Farrell next deeded a lot carrying a width of 150 feet to Herman J. Kropper and wife, the southerly line of the lot being the Baker northerly line. The Kroppers bought an additional strip of land 50 feet wide from Mr. Farrell which adjoined their land on the north.

This court, by Justice Barney, said in its prior opinion of this case, 125 Vt. at page 5, 209 A.2d at page 307:

"To support the judgment, it is essential that the findings, or at least the evidence, firmly establish the existence of an exactly parallel relationship between the Cordner fence line and the Guay-Kropper boundary, either directly, or through their origins, if the disputed line is to be located by reference to the Cordner fence and the Barr north bound. If such a relationship cannot be evidenced, some other descriptive reference of positive effect must be established. This issue requires clear resolution, and has not had it."

The plaintiff contends that the evidence shows the boundary between the Kroppers and Farrell is established by acquiescence commencing at the time the 50-foot strip of land was bought by the Kroppers from Farrell on July 7, 1943. Plaintiff urges such acquiescence fixes the Guay-Kropper boundary as it claims it to be. The survey map, Plaintiff's Exhibit 9, made by Mr. Buck shows iron pipes or pins at or near the corners of several of the lots including the northwest and northeast corners of the Kropper lot. These are markers which Mr. Buck says he found in the ground at the time of his surveys.

The plaintiff claims the established boundary line on the south of the Guay lot must relate to and mean the iron pipes or pins which were put in place by Farrell and Kropper when the latter purchased the 50-foot strip.

We are confronted, however, with the fact that there is no mention of iron markers, or any monuments, from which the corners of the lots can be ascertained. Nor is there any evidence to show that the iron pipes or pins found by Mr. Buck are on a boundary line parallel to the Cordner wire fence. Mr. Buck testified that he did not survey north of the Barr lot or survey the course of the Cordner fence line.

It is clear that the lines of all of the former Farrell lots are fixed, and must be determined, from a survey of the angles and courses of the south fence line of the Cordner lot. And it is only from this that the true boundaries can be established.

■ The iron pipes placed in the north line of the 50-foot lot of the Kroppers by Mr. Farrell and Kropper was on or about July 7, 1943, the date of the deed. The Guays acquired their lot from Leroy S. Walker on November 4, 1957, some months short of a 15-year period after the Kroppers took title. For this reason the questioned boundary cannot be established by acquiescence.

In *Amey* v. *Hall,* 123 Vt. 62, 66, 181 A.2d 69, 72, this court held:

"To acquire title to the limits of a boundary that has been established by acquiescence there must be a mutual recognition of the particular line by the adjoining owners coupled with continuous possession by one or both parties for the length of time required for adverse possession. * * *

"To be conclusive, the acquiescence must endure for the period of fifteen years. (cases cited) Passive compliance for a lesser period of time will not settle the issue, and if done by agreement the contract must meet the requirements of the statute of frauds."

Moreover, there is no evidence of a continuity of acquiescence after the date Farrell conveyed to Eileen Farrell in April 1945 and the latter conveyed to Leroy S. Walker in August 1945.

■■■ A finding, like all other findings, to which exceptions are taken, must stand if it can be supported upon any rational view of the evidence provided there is legitimate evidence fairly and reasonably tending to sustain it. The fact that the evidence is conflicting cannot avail the excepting party for all conflicts must be resolved against him on review. And the weight of the evidence and the credibility of the witnesses are for the trier of facts to determine. *Tower* v. *Tower,* 120 Vt. 213, 218-219, 138 A.2d 602.

■■■ The trial court found "the northerly boundary line of the property of the defendants is a line 244 feet southerly and parallel to said woven wire fence." In other words, the court fixed the northern Guay boundary line as beginning at a point on the highway 530 feet northerly from the concrete highway marker and running parallel to the Cordner (Thomas) south line.

The evidence reasonably supports the findings of the trial court. The findings sustain the judgment order and "firmly establish the existence of an exactly parallel relationship between the Cordner southern fence line and the Guay-Kropper boundary" as we said in our previous opinion it must do.

*Judgment affirmed.*

**Smith, J.,** sat but due to illness did not participate in the decision.